<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BARRY BENZING, JAMES CAFFREY, MAE DE LA CALZADA-JEANLOUIE, DAVID CATAQUET, MARIA CHIRINO, SCOTT FIORINI, ARLENE FREDERICKS, RAFIK HANNA, BRANDON KULEY, AMRIT KHATRICHETTRI, DENNIS LAIRD, SAMUEL MATTHEWS, PATRICIA PAMY, AREEBA REHMAN, KAITLYN TINTERA, KIRK TOMLINSON, WENDY WHEELER, and LARRY WOLK, <br><br> Plaintiffs, <br><br> v. <br><br> PRIME HEALTHCARE SERVICES, INC.; PRIME HEALTHCARE SERVICES - ST. MICHAEL'S LLC, *doing business as* ST. MICHAEL'S MEDICAL CENTER; and PREM REDDY, *Prime Healthcare Chief Executive Officer*, <br><br> Defendants. | Case No. 2:25-cv-18593 (BRM) (MAH) <br><br><br> **OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendants Prime Healthcare Services, Inc. ("Prime"), Prime Healthcare Services - St. Michael's LLC d/b/a St. Michael's Medical Center ("St. Michael's"), and Dr. Prem Reddy's ("Dr. Reddy") (collectively, "Defendants") Motion to Dismiss ("Motion") (ECF No. 22) Plaintiffs Barry Benzing, James Caffrey, Mae De La Calzada-Jeanlouie, David Cataquet, Maria Chirino, Scott Fiorini, Arlene Fredericks, Rafik Hanna, Brandon Kuley, Amrit Khatrichettri, Dennis Laird, Samuel Matthews, Patricia Pamy, Areeba Rehman, Kaitlyn Tintera, Kirk Tomlinson,

1

Wendy Wheeler, and Larry Wolk's ("Plaintiffs") Amended Complaint (ECF No. 12) pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Plaintiffs filed an Opposition (ECF No. 23), and Defendants filed a Reply (ECF No. 24). Having reviewed and considered the parties' submissions filed in connection with the Motion and having held oral argument on June 16, 2026, pursuant to Rule 78(a), for the reasons set forth below and for good cause having been shown, Defendants' Motion is **DENIED**.

I.    BACKGROUND

A.  Factual Background

For purposes of the Motion, the Court accepts the factual allegations in the Amended Complaint as true and draws all inferences in the light most favorable to Plaintiffs. *See Philips v. Cnty. of Alleghany*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document *integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

St. Michael's is a hospital that "provides general emergency services and a broad range of care." (ECF No. 12 ¶¶ 2, 18.) Organized as a limited liability company, St. Michael's has one member—Prime. (*Id.* ¶ 2.) Dr. Reddy is Prime's founder, chairman, and chief executive officer. (*Id.* ¶ 13.) Plaintiffs are physicians, physician assistants, or nurse practitioners who worked in St. Michael's emergency department in September, October, and/or November 2024. (*Id.* ¶ 25.)

During the fall of 2024, Prime contracted with National Emergency Services Health (together with its affiliates, "NES") to staff Prime's emergency department with doctors and "mid-level" healthcare providers. (*Id.* ¶¶ 1, 3.) By September 2024, NES was delaying payment to Plaintiffs. (*Id.* ¶ 4.) By November 22, 2024, Plaintiffs learned NES was closing and Prime had

contracted with another staffing company "to pick up where NES left off." (*Id.* ¶ 5.) NES filed for Chapter 7 bankruptcy by February 2025, "taking the billings for work Plaintiffs performed in September, October, and November of 2024 while still not paying Plaintiffs their wages for doing the work on which the billings were based." (*Id.* ¶ 7.) Plaintiffs claim they are owed "eight to ten weeks of back pay" for staffing St. Michael's emergency department and treating its patients. (*Id.* ¶ 6.)

Plaintiffs allege various ways in which Defendants exerted control over their relationship. (*Id.* ¶¶ 31–45.) Dr. Reddy issued directives regarding how Plaintiffs were to perform their jobs "during quarterly review meetings on efficiency and utilization, as well as by personally overseeing the implementation of uniform protocols that are applicable throughout hospitals controlled by Prime." (*Id.* ¶ 32.) Additionally, Dr. Reddy "controlled and directed the manner in which Plaintiffs performed their work practicing medicine." (*Id.* ¶ 34.) For example, Dr. Reddy "[p]ersonally conduct[ed] quarterly utilization reviews" and requested the "CEO, CMO, CNO, ED Physician Director, and ED Physicians of St. Michael's attend the quarterly meetings"; gave detailed directives "regarding how to manage patient care"; "[d]irect[ed] Plaintiffs to limit the use of CAT scans and radiology facilities, medication, length of time spent with patients, and length of time between admission and discharge"; "[i]nstruct[ed] Plaintiffs to limit blood tests . . . , a CTA chest test . . . , and direct[ed] Plaintiffs not to order CT scans on elderly patients who may have fallen even though that instruction did not comport with the recognized standard of care for elderly patients"; "[i]nstruct[ed] Plaintiffs to refrain from performing patient workups" in certain circumstances; and "[d]irect[ed] Plaintiffs on which types of patients to admit." (*Id.* ¶¶ 34–35.)

Leadership at St. Michael's worked to ensure Dr. Reddy's directives "were carried out by physicians in the Emergency Department, including by implementing protocols consistent with

3

[those] directives." (*Id.* ¶ 37.) Further, St. Michael's leadership: "[s]et[] protocols for treatment modalities including but not limited to stroke, IV medication procedures, blood transfusion consent, and DKA regimen"; "[r]equir[ed] Plaintiffs to attend department meetings during which protocols were set and discussed including on topics as door to room time, doctor to patient time, and CT use"; "[d]irect[ed] Plaintiffs to admit certain types of patients"; "[m]onitor[ed] Plaintiff patient care by use of Emergency Department Quality and Utilization Reports"; "[i]nstruct[ed] site directors how to deal with grievances about practitioners in the Emergency Department, such as whether to take disciplinary action up to and including discharge of the practitioner who was the subject of the grievance"; "[s]et[] the expectation that Plaintiffs train residents, medical students, and physician assistant students and supervise their patient treatment"; "[r]equir[ed] Plaintiffs to meet the obligations set forth in the contracts between the St. Michael's and NES"; "controlled hospital credentialing, . . . including who can perform specific procedures"; "retained and exercised the right to discipline and terminate ER staff provided by NES, including Plaintiffs"; and "supplied all necessary equipment, tools and supplies Plaintiffs required to perform their job." (*Id.* ¶¶ 38–39, 43–44.)

Plaintiffs also allege emergency departments "are a critical part of Prime's business." (*Id.* ¶ 46.) Hospital services performed in St. Michael's emergency department generated revenue for St. Michael's, and "hospital admission stays that came through" the emergency department provided financial benefits for St. Michael's. (*Id.* ¶¶ 53–54.) The revenue and financial benefits also enriched Prime, as St. Michael's sole member. (*Id.* ¶ 55.) Plaintiffs also assert, on information and belief, Dr. Reddy "directed some or all of those profits to himself and gained [from] the increased value of his equity interests in Prime." (*Id.* ¶ 56.)

4

Plaintiffs further assert "Prime shared its responsibilities as an employer with NES." (*Id.* ¶ 58.) While Prime "outsource[d] recruiting and payroll services to NES," Prime "dictated the terms and conditions of the NES recruiting and payroll process." (*Id.* ¶¶ 58–59.) Prime received assurances from NES that "each Practitioner would perform services in accordance with all applicable bylaws, rules, regulations, procedures and policies of Prime and its subsidiary entities." (*Id.* ¶ 61.)

By November 15, 2024, Defendants learned "NES decided to wind down its operations and cease doing business." (*Id.* ¶ 80.) Defendants benefited financially from work Plaintiffs performed in September, October, and November of 2024, but neither NES nor Defendants paid Plaintiffs their wages, stipends, or work-related expenses for such work. (*Id.* ¶¶ 83–86.)

### B. Procedural History

Defendants removed this action from the Superior Court of New Jersey, Law Division, Essex County, on December 12, 2025. (ECF No. 1.) On January 7, 2026, Plaintiffs filed the Amended Complaint. (ECF No. 12.) Defendants filed their Motion to Dismiss on February 12, 2026. (ECF No. 22.) Plaintiffs filed an Opposition on March 2, 2026 (ECF No. 23), and Defendants replied on March 9, 2026 (ECF No. 24). On June 9, 2026, Defendants filed a Notice of Supplemental Authority. (ECF No. 30.) The Court held oral argument on June 16, 2026. (ECF No. 31.)

### II.    LEGAL STANDARD

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl.*

5

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957); and then quoting Fed. R. Civ. P. 8(a)(2)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This "plausibility standard" requires the complaint to allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "[D]etailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pled; it must include "factual enhancement" and not just conclusory statements or a "recitation of the elements of a cause of action." *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). In assessing plausibility, the court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common

6

sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show the claim is facially plausible, allowing "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 570). The Supreme Court's ruling in *Iqbal* emphasizes a plaintiff must show the allegations of his or her complaints are plausible. *See id.* at 670.

While, generally, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory*, 114 F.3d at 1426 (quoting *Shaw*, 82 F.3d at 1220). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Princeton Univ.*, 30 F.4th at 342.

## III.    DECISION

Defendants argue the Amended Complaint does not plausibly allege a cause of action. (*See* ECF No. 22-1.) Specifically, Defendants contend Plaintiffs have not sufficiently plead the following claims: (1) a violation of New Jersey's Wage Payment Law ("NJWPL"), N.J. Stat. Ann.

§§ 34:11-4.1, *et seq.*, (*id.* at 5–13), (2) breach of an implied contract (*id.* at 13–17), or (3) unjust enrichment (*id.* at 17–19). The Court addresses each claim for relief in turn.

### A.  The NJWPL

Plaintiffs bring a claim against all Defendants under the NJWPL. (ECF No. 12 ¶¶ 90–97.) Defendants argue "there are no non-conclusory allegations in the Amended Complaint to suggest that *any* Defendant . . . was Plaintiffs' direct employer." (ECF No. 22-1 at 5–6.) As for Plaintiffs' joint employment theory, Defendants point to *In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation ("Enterprise")*, 683 F.3d 462 (3d Cir. 2012), and assert "Plaintiffs do not plead sufficient facts to suggest that any Defendant met the *Enterprise* test for joint employment." (*Id.* at 12.) Defendants also argue Plaintiffs may not save their NJWPL claim by relying on the New Jersey Wage Collection Law ("NJWCL"), N.J. Stat. Ann. § 34:11-57–67.2, because "a plaintiff may not invoke the NJWCL in the first instance by filing a claim in this Court." (*Id.* at 12–13 (citing *Mahanor v. Berkley Life Sciences*, Civ. A. No. 21-18981, 2022 WL 2541773, at *16–20 (D.N.J. July 7, 2022)).) Plaintiffs respond that each Defendant is a direct employer of Plaintiffs (ECF No. 23 at 6–9), and, even under the *Enterprise* test, Defendants are also Plaintiffs' joint employers (*id.* at 9–12). Additionally, Plaintiffs posit Defendants' arguments are foreclosed by the "client employer" provision of the NJWCL. (*Id.* at 13–15.)

The NJWPL "'governs the time and mode of payment of wages due to employees,' and is a remedial statute to be construed liberally." *Maia v. IEW Constr. Grp.*, 313 A.3d 887, 895 (N.J. 2024) (quoting *Hargrove v. Sleepy's, LLC*, 106 A.3d 449, 457 (N.J. 2015)). It "is designed to protect an employee's wages and to assure timely and predictable payment." *Ortez v. Beta Elec. ELP, LLC*, Civ. A. No. 23-3693, 2025 WL 2169973, at *6 (D.N.J. July 31, 2025) (quoting *Hargrove*, 106 A.3d at 463). Under the NJWPL, and subject to certain exceptions, "[n]o employer

8

may withhold . . . an employee's wages." *Musker v. Suuchi, Inc.*, 331 A.3d 900, 905 (N.J. 2025) (quoting N.J. Stat. Ann. § 34:11-4.4). "If an employer violates the [NJ]WPL, an employee may seek damages in a private cause of action." *Id.*

The parties' dispute centers around whether any Defendant was Plaintiffs' "employer" under the NJWPL.[1] Before analyzing Plaintiffs' and Defendants' alleged employment relationship, the Court must first decide which test governs. Plaintiffs contend in determining whether an employment relationship exists under the NJWPL, "New Jersey Courts now apply the 'ABC' test, adopted by the New Jersey Supreme Court in *Hargrove*." (ECF No. 23 at 6–7.) By contrast, Defendants argue the *Enterprise* test applies. (ECF No. 22-1 at 8.)

*Hargrove* held the ABC test "governs whether a plaintiff is an employee or independent contractor for purposes of resolving a wage-payment or wage-and-hour claim." 106 A.3d at 453. The ABC test, therefore, focuses on the status of the worker, not on *who* potentially employed the worker. *See id.* at 465 ("[W]e hold that employment-status issues raised under the [NJ]WPL . . . [,] i.e., whether a person retained to provide services to an employer is an employee or independent contractor[, ]are governed by the 'ABC' test."); *Echavarria v. Williams Sonoma, Inc. ("Echavarria I")*, Civ. A. No. 15-6441, 2016 WL 1047225, at *3 (D.N.J. Mar. 16, 2016) ("*Hargrove* does not discuss which test a court should use to determine who employed a given plaintiff."); *Perez v.*

---

[1] The NJWPL defines an employer as "any individual, partnership, association, joint stock company, trust, corporation, the administrator or executor of the estate of a deceased individual, or the receiver, trustee, or successor of any of the same, employing any person in this State." N.J. Stat. Ann. § 34:11-4.1(a). Moreover, as Plaintiffs stressed at oral argument with respect to Dr. Reddy, "the officers of a corporation and any agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation." *Id.*; *see also Cruz v. Aspen Landscaping Contracting, Inc.*, No. A-2157-22, 2024 WL 5230483, at *7 (N.J. Super. Ct. App. Div. Dec. 27, 2024) ("Consistent with its purpose, the [NJ]WPL provides that 'officers and managers of an employing corporation [are] personally liable if that corporation fails to pay wages to an employee in violation of the statute.'" (quoting *Musker v. Suuchi, Inc.*, 318 A.3d 692, 695 (N.J. Super. Ct. App. Div. 2024), *rev'd on other grounds*, 331 A.3d 900 (N.J. 2025)).

*Access Bio, Inc.*, No. A-3071-16T4, 2019 WL 3297297, at *6 (N.J. Super. Ct. App. Div. July 23, 2019) ("[T]he [New Jersey Supreme] Court did not make its holding in *Hargrove* applicable to all employment status disputes under the . . . [NJ]WPL, but rather focused on the distinction between an employee and an independent contractor."); *Espinal v. Bob's Discount Furniture, LLC*, Civ. A. No. 17-2854, 2020 WL 6055123, at *5 (D.N.J. Oct. 14, 2020) ("The ABC Test is properly applied to ascertain whether a worker should be considered an employee or an independent contractor."). Simply put, the "ABC test is not used to determine the *existence* of an employment relationship, and *Hargrove* does not say otherwise." *Echavarria v. Williams Sonoma, Inc. ("Echavarria II")*, Civ. A. No. 15-6441, 2016 WL 1670934, at *3 (D.N.J. Apr. 27, 2016).[2]

Therefore, "before applying the ABC test, the Court ha[s] to make a threshold determination as to who employed the Plaintiffs." *Echavarria II*, 2016 WL 1670934, at *2; *see also Echavarria I*, 2016 WL 1047225, at *4 ("[C]ourts may not apply the ABC test before determining who employed a plaintiff."). "To resolve that [threshold] inquiry, the [*Enterprise*] joint employer test . . . is the proper test to apply." *Espinal*, 2020 WL 6055123, at *5; *see also Perez*, 2019 WL 3297297, at *6 ("[T]he question to be resolved in this case is whether or not Access Bio was a joint employer in addition to [a staffing agency] . . . . We agree with the trial court that this inquiry is not controlled by *Hargrove*, but is best decided using the joint employer test set forth in *Enterprise*.").[3]

---

[2] Indeed, *Hargrove* answered a certified question from the United States Court of Appeals for the Third Circuit. 106 A.3d at 453. Interpreting *Hargrove*, the Third Circuit subsequently clarified the New Jersey Supreme Court "held that the same test should be used to determine the nature of an employment relationship under both the . . . [NJWPL] and the New Jersey Wage and Hour Law, and . . . the 'ABC' test[] would be used to make employment status determinations under both laws." *Hargrove v. Sleepy's LLC*, 612 F. App'x 116, 118 (3d Cir. 2015).

[3] As Defendants pointed out at oral argument, adopting Plaintiffs' argument as to the ABC test would create an intra-district split on this issue. In finding the *Enterprise* test applies before the

In sum, the Court will apply the *Enterprise* test to determine whether Plaintiffs have sufficiently alleged Defendants[4] employed Plaintiffs and then the ABC test to decide whether Plaintiffs are employees or independent contractors.

### 1. The *Enterprise* Test

"To determine whether an alleged employer is a joint employer, courts consider the following factors set forth in" *Enterprise*:

> 1) the alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules,

---

ABC test here, the Court avoids departing from the other courts in this district that have considered the issue. Moreover, while Plaintiffs cite to a New Jersey Appellate Division case supporting their position, a more recent Appellate Division decision supports Defendants' position. *Compare Veras v. Interglobo N. Am., Inc.*, No. A-3313-16T1, 2018 WL 5316459, at *5 (N.J. Super. Ct. App. Div. Oct. 29, 2018) (rejecting argument the economic realities test "applies to the determination of who is the employer that is necessary before considering whether an employee is an independent contractor"), *with Perez v. Access Bio, Inc.*, No. A-3071-16T4, 2019 WL 3297297, at *6 (N.J. Super. Ct. App. Div. July 23, 2019) (explaining *Hargrove* "focused on the distinction between an employee and an independent contractor" and is not "applicable to all employment status disputes" under the NJWPL).

Additionally, although some of the cases Defendants rely on involved a different procedural posture such as summary judgment—*see, e.g.*, *Echavarria v. Williams Sonoma, Inc.*, Civ. A. No. 15-6441, 2016 WL 1047225, at *1 (D.N.J. Mar. 16, 2016); *Perez*, 2019 WL 3297297, at *1—that does not prevent the Court from deciding the applicable test at this point in the litigation. Indeed, both parties made clear at oral argument they would prefer the Court decide which test applies in this Opinion.

[4] Defendants briefly contend Plaintiffs must also "provide sufficient information to plausibly show they were NES's employee." (ECF No. 22-1 at 7–8.) The Court disagrees. Given Plaintiffs' allegations of joint employment, there is "no circumstance" in which the factfinder will be required to find NES is Plaintiffs' employer. *Sullivan-Blake v. FedEx Ground Package Sys., Inc.*, Civ. A. No. 18-1698, 2020 WL 2572273, at *7 (W.D. Pa. May 21, 2020); *see also id.* ("If Plaintiffs are entitled to overtime compensation under the [Fair Labor Standards Act ('FLSA')] and the factfinder finds that FedEx is a joint employer under the FLSA, then FedEx is jointly and severally liable for the damages suffered by Plaintiffs and no finding as to any nonparty's liability is necessary."); *Kim v. Eco Pro LLC*, Civ. A. No. 22-7281, 2024 WL 1006262, at *4 (D.N.J. Mar. 8, 2024) (explaining the FLSA, NJWHL, and NJWPL "should be resolved 'by the same standard'" (quoting *Brunozzi v. Crossmark, Inc.*, Civ. A. No. 13-4585, 2016 WL 112455, at *5 (D.N.J. Jan. 11, 2016))).

11

including the rate and method of payment; 3) the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

*Talarico v. Pub. P'ships, LLC*, 837 F. App'x 81, 84 (3d Cir. 2020) (quoting *Enterprise*, 683 F.3d at 469). "These factors are not exhaustive, and whether an alleged employer is a joint employer depends on the 'total employment situation and the economic realities of the work relationship.'" *Id.* (quoting *Enterprise*, 683 F.3d at 469). The Court need not find each of the *Enterprise* factors is present to make a finding of joint employment. *Id.* In short, "these factors should not be 'blindly applied,' rather courts should examine all relevant evidence." *Echavarria I*, 2016 WL 1047225, at *4 (quoting *Enterprise*, 683 F.3d at 469).

The *Enterprise* inquiry is "highly fact specific." *Morales v. Aqua Pazza LLC*, Civ. A. No. 20-6690, 2022 WL 1718050, at *3 (D.N.J. May 27, 2022). "Discovery is often necessary before a plaintiff can reliably define the contours of the employment relationship." *Kolev v. Nat'l Freight, Inc.*, Civ. A. No. 21-15107, 2023 WL 3033572, at *5 (D.N.J. Apr. 20, 2023) (quoting *Anderson v. Finley Catering Co.*, 218 F. Supp. 3d 417, 423 (E.D. Pa. 2016)). Therefore, an analysis under the *Enterprise* test is "typically unsuitable for resolution on the pleadings." *Morales*, 2022 WL 1718050, at *3; *cf. Echavarria I*, 2016 WL 1047225, at *3–4 (explaining the economic realities test, which contains "very similar" factors as the *Enterprise* test, demands a "fact-intensive" examination, and "therefore it is rare for a court to determine who employed a given plaintiff on summary judgment").

Turning to the first *Enterprise* factor, *i.e.*, "the alleged employer's authority to hire and fire the relevant employees," 683 F.3d at 469, Plaintiffs allege "St. Michael's, on behalf of itself and as an agent of Prime and [Dr.] Reddy, retained and exercised the right to discipline and terminate ER staff provided by NES, including Plaintiffs." (ECF No. 12 ¶ 43.) Plaintiffs further assert "Prime

12

dictated the terms and conditions of the NES recruiting and payroll processes." (*Id.* ¶ 59.) Defendants argue "the contract between NES and . . . [St. Michael's] states that NES 'shall have the sole responsibility to compensate' Plaintiffs" (ECF No. 24 at 5 (quoting ECF No. 12-1 ¶ 4(c)), but the Court is unpersuaded because "[t]he *Enterprise* test does not require direct remuneration," *Echavarria I*, 2016 WL 1047225, at *6 (finding a jury could find an alleged employer "had an employment relationship with [the] [p]laintiffs, even absent direct remuneration"). The Court finds the allegations as to factor one, while not extensive, nevertheless support the conclusion Defendants were Plaintiffs' employer. *See id.* (concluding the first *Enterprise* factor could support a finding of joint employment when the alleged employer "exercised some authority over the hiring" of the plaintiffs).

As for the second *Enterprise* factor, *i.e.*, "the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment," 683 F.3d at 469, Plaintiffs contend Prime "actively manages" its hospitals and controls how practitioners at those hospitals practice medicine "through the direction of its agents, and the implementation of uniform policies and protocols." (ECF No. 12 ¶ 11.) For example, Defendants set "protocols for treatment modalities including but not limited to stroke, IV medication procedures, blood transfusion consent, and DKA regimen," and required "Plaintiffs to attend department meetings during which protocols were set." (*Id.* ¶ 38(a)–(b).) Defendants also controlled the type of patients to be admitted, monitored Plaintiffs' patient care, and established expectations that Plaintiffs train certain residents and students. (*Id.* ¶ 38(c)–(d), (f).) Moreover, Dr. Reddy, individually and as Prime's agent, personally conducted "quarterly utilization reviews" and instructed Plaintiffs to

limit certain tests and scans and to refrain from conducting "patient workups" in certain circumstances. (*Id.* ¶ 34(a), (c)–(d).)

Defendants argue their issuance of directives and establishment of protocols do not demonstrate control over Plaintiffs' medical practice but are rather examples of St. Michael's discharging its own obligations under the law. (ECF No. 24 at 5.) However, Defendants do not cite any binding case law to show discharging a legal duty negates control. (*See generally* ECF Nos. 22, 24.) Put differently, Defendants provide no authority for the proposition an alleged employer lacks control over its workers merely because it is complying with the law. The Court is unpersuaded by such an argument. For example, Defendants note state law provides hospitals must have "written policies, procedures, and bylaws." (*Id.* at 4 (quoting N.J. Admin. Code § 8:43G-16.2).) But a hospital issuing such a policy, procedure, or bylaw may still have control over the workers subject to same. Therefore, at this stage of the litigation, the Court is satisfied the Amended Complaint contains allegations pertaining to factor two that support the conclusion Defendants were joint employers. *See Echavarria I*, 2016 WL 1047225, at *6 (concluding the second *Enterprise* factor could support a finding of joint employment when alleged employer "set certain conditions of employment").

For the third *Enterprise* factor, *i.e.*, "the alleged employer's involvement in day-to-day employee supervision, including employee discipline," 683 F.3d at 469, Plaintiffs allege Dr. Reddy, individually and as Prime's agent, directed "Plaintiffs to limit the use of CAT scans and radiology facilities, medication, length of time spent with patients, and length of time between admission and discharge" (ECF No. 12 ¶ 34(b)). Defendants also provided instructions to site directors about how to handle grievances against practitioners, including whether to discipline or discharge the practitioner to whom a grievance was directed. (*Id.* ¶ 38(e).) Again, at this early

14

pleading stage, the Court finds these allegations tend to support a finding of joint employment under factor three.

As for the fourth *Enterprise* factor, *i.e.*, "the alleged employer's actual control of employee records, such as payroll, insurance, or taxes," 683 F.3d at 469, the Court agrees with Defendants and finds Plaintiffs' allegations do not appear to indicate Defendants had actual control over Plaintiffs' records.

After examining the "total employment situation and the economic realities of the work relationship," *Talarico*, 837 F. App'x at 84 (quoting *Enterprise*, 683 F.3d at 469), and considering how the *Enterprise* test is "typically unsuitable for resolution on the pleadings," *Morales*, 2022 WL 1718050, at *3, the Court concludes Plaintiffs have sufficiently alleged Defendants are their joint employers for purposes of the NJWPL.

### 2.  The ABC Test

The ABC test "assumes that an employer's worker is an employee, not an independent contractor, unless an employer can show" the following:

> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and
> (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
> (C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

*Echavarria I*, 2016 WL 1047225, at *6–7 (quoting *Hargrove*, 106 A.3d at 458). "Under the ABC test, if an employer fails to satisfy any one prong, the workers must be classified as employees." *Id.* at *7. Like the question of whether an entity is an employer, "whether a plaintiff is an employee

can rarely be resolved on a motion to dismiss." *Kolev*, 2023 WL 3033572, at \*5 (quoting *Contee v. Univ. of Pa.*, Civ. A. No. 21-1398, 2021 WL 2661459, at \*4 (E.D. Pa. June 29, 2021)).

Because the Court has determined Plaintiffs sufficiently alleged Defendants exerted at least some control over Plaintiffs, *see supra* Section III.A.1, the Court finds Defendants have failed to satisfy prong "A" of the ABC test. Indeed, Defendants do not specifically argue Plaintiffs are not employees under the ABC test, instead focusing their argument on the *Enterprise* test. (*See* ECF No. 22-1; ECF No. 24 at 1–8.) As such, the Court concludes Plaintiffs' have alleged they are employees under the ABC test. *See Echavarria I*, 2016 WL 1047225, at \*7 (concluding "workers must be classified as employees" prong "A" of the ABC test was not satisfied). Accordingly, Defendants' Motion to Dismiss Plaintiffs' NJWPL claim is **DENIED**.[5]

### B. Breach of Implied-in-Fact Contract

Plaintiffs bring a claim against St. Michael's and Prime for breach of an implied-in-fact contract. (ECF No. 12 ¶¶ 98–110.) As for St. Michael's, Defendants argue "[n]othing in Plaintiffs' allegations shows mutual assent by St. Michael's to enter a compensation relationship with them." (ECF No. 22-1 at 14.) As for Prime, Defendants contend the Amended Complaint lacks allegations suggesting 'Plaintiffs performed services for or on behalf of Prime," "consideration flowed between Plaintiffs and Prime," or Prime mutually assented to entering a contract. (*Id.* at 15.) Plaintiffs respond they have adequately pled the elements of an implied-in-fact contract. (ECF No. 23 at 15–17.)

The Third Circuit has stated, "[a]n implied-in-fact contract . . . is a true contract arising from mutual agreement and intent to promise, but in circumstances in which the agreement and

---

[5] Because the Court has found Plaintiffs' adequately alleged Defendants were their employer, the Court need not address Defendants' argument regarding the NJWCL. (*See* ECF No. 22-1 at 12–13.)

promise have not been verbally expressed." *Baer v. Chase*, 392 F.3d 609, 616 (3d Cir. 2004) (quoting *In re Penn Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir. 1987)). To survive Defendants' motion to dismiss, Plaintiffs must allege the elements of a contract claim: "(1) the parties entered into a valid contract, (2) the defendant did not perform his or her obligations under the contract, and (3) the plaintiff suffered damages as a result." *Days Inn Worldwide, Inc. v. Shara & Sons, Inc.*, Civ. A. No. 13-1049, 2013 WL 5535959, at *3 (D.N.J. Oct. 7, 2013) (quoting *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007)). Plaintiffs allege St. Michael's and Prime have not performed their obligations because they did not compensate Plaintiffs for services rendered in September, October, and/or November 2024. Failure to pay Plaintiffs for their work constitutes damage. With prongs two and three being satisfied, the question becomes whether the parties entered a valid contract.

Here, the Court finds the Amended Complaint contains sufficient allegations demonstrating St. Michael's and Prime entered into an implied contract with Plaintiffs. Plaintiffs allege NES was delaying payment by September 2024, but nevertheless, Plaintiffs still reported to work and continued to staff St. Michael's emergency department in September, October, and/or November 2024. (ECF No. 12 ¶¶ 4–6.) During that time, St. Michael's and Prime accepted Plaintiffs' services—even though Plaintiffs were not receiving timely payment from NES—and did not indicate an understanding Plaintiffs would be working without pay. (*Id.* ¶¶ 83–84, 104, 109.) Under these circumstances, taking all reasonable inferences in favor of Plaintiffs and considering the early stage in the litigation, Plaintiffs plausibly allege mutual assent from St. Michael's and Prime. *See Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 285 (N.J. 1992) ("[W]here an offeree gives no indication that he or she objects to any of the offer's essential terms, and passively accepts the benefits of an offeror's performance, the offeree has impliedly manifested

his or her unconditional assent to the terms of the offer.").[6] Accordingly, Defendants' Motion to Dismiss Plaintiffs' implied-in-fact contract claim is **DENIED**.

### C. Unjust Enrichment

Plaintiffs bring a claim for unjust enrichment against all Defendants. (ECF No. 12 ¶¶ 111–22.) Defendants argue Plaintiffs have not plausibly plead unjust enrichment because "there is no direct relationship between Plaintiffs and any Defendant," "there is no plausible allegation that Plaintiffs conferred a benefit on Defendants," Plaintiffs did not expect remuneration from Defendants, and any liability should "not passed on to Prime (or its CEO) merely by virtue of Prime's business relationship to St. Michael's." (ECF No. 22-1 at 17–19.) Plaintiffs maintain they "have adequately pled a sufficient relationship between Plaintiffs and each Defendant to support an unjust enrichment claim," "it is plainly plausible to infer that having doctors, physician assistants, and nurse practitioners work for free enriches a hospital and its owners," they "continued to show up for their shifts . . . with the reasonable expectation that they would be compensated for their work," and Prime and Dr. Reddy "issued detailed instructions directly to Plaintiffs" and "enjoyed the profits that flowed from Plaintiffs' work." (ECF No. 23 at 18–21.)

"To establish a claim of unjust enrichment in New Jersey, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'"

---

[6] Defendants argue they "did not learn of NES' financial troubles until the end of November 2024," (ECF No. 24 at 12 (citing ECF No. 12 ¶ 80)), and therefore did not have the "requisite knowledge to reach a 'consensual understanding' regarding the obligation to compensate Plaintiffs in NES' place" (*id.* at 13). However, paragraph 80 of the Amended Complaint states, "[o]n information and belief, Prime, Reddy, and St. Michael's learned on or around November 15, 2024 that NES decided to wind down its operations and cease doing business." (ECF No. 12 ¶ 80.) Taken in the light most favorable to the Plaintiffs, this allegation relates to when Defendants learned of the ultimate demise of NES' business, not necessarily when they learned of NES' "financial troubles." Therefore, paragraph 80 does not establish Defendants were unaware of any financial difficulties on the part of NES prior to November 2024.

*Hughes v. Panasonic Consumer Elecs. Co.*, Civ. A. No. 10-846, 2011 WL 2976839, at \*26 (D.N.J. July 21, 2011) (quoting *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 723 (N.J. 2007)). "[T]he equitable remedy of unjust enrichment is not available when there is a valid contract" between the parties. *Joseph Oat Holdings, Inc. v. RCM Digesters, Inc.*, Civ. A. No. 06-4449, 2009 WL 900758, at \*7 (D.N.J. Mar. 31, 2009) (citing *Van Orman v. Am. Ins. Co.*, 680 F.2d 301, 310 (3d Cir. 1982)). "Furthermore, unjust enrichment 'requires [the] plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.'" *Hughes*, 2011 WL 2976839, at \*26 (quoting *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 554 (N.J. 1994)). Also, "a claim for unjust enrichment requires a direct relationship between the parties." *Hammer v. Vital Pharms., Inc.*, Civ. A. No. 11-4124, 2012 WL 1018842, at \*10 (D.N.J. Mar. 26, 2012); *see also Bedi v. BMW of N. Am., LLC*, Civ. A. No. 15-1898, 2016 WL 324950, at \*5 (D.N.J. Jan. 27, 2016) ("[T]here must be a direct relationship to assert an unjust enrichment claim."). "[I]t is the plaintiff's (as opposed to a third party's) conferral of a benefit on defendant which forms the basis of an unjust enrichment claim." *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 496 (D.N.J. 1998).

Here, Plaintiffs allege sufficient facts to support a claim for unjust enrichment. Plaintiffs allege Defendants received a benefit from Plaintiffs "continuing to staff [St. Michael's] emergency room for eight to ten weeks." (ECF No. 12 ¶¶ 25, 83, 113–14, 120.) Plaintiffs also assert "St. Michael's continued to benefit from Plaintiff[s'] services in September, October, and November of 2024 by billing for hospital services associated with the Emergency Department and for services associated with hospital admissions generated from Emergency Department operations." (*Id.* ¶ 84.) Because "emergency departments permit hospitals to generate business by admitting patients who come to the hospital for emergency department services," "St. Michael's benefitted financially

19

from profitable hospital admission stays that came through its Emergency Department." (*Id.* ¶¶ 51–54.) It is plausible to infer St. Michael's profits generated due to Plaintiffs' work also benefited St. Michael's sole member (Prime) and that member's CEO (Dr. Reddy). (*See id.* ¶¶ 54–57 (alleging Prime and Dr. Reddy were "enriched by revenue collected for hospital services associated with the St. Michael's Emergency Department and from billable services associated with hospital admissions that were generated through the operations of the St. Michael's Emergency Department").

Moreover, Plaintiffs plausibly allege they expected payment from Defendants—Plaintiffs continued to staff the emergency department despite delays in payment. (ECF No. 12 ¶¶ 4–7, 25, 83–84, 114, 120.) Retaining the benefits of Plaintiffs' work at Plaintiffs' expense, and when Plaintiffs expected to be compensated, would be unjust. *Maersk Line v. TJM Int'l Ltd. Liab. Co.*, 427 F.Supp.3d 528, 535 (D.N.J. 2019) ("Retention is unjust when the plaintiff expects payment for the service or the defendant retains a benefit at the expense of the plaintiff." (citing *Assocs. Com. Corp. v. Wallia*, 511 A.2d 709, 716 (N.J. Super. Ct. App. Div. 1986))). Finally, Plaintiffs had a sufficient relationship with Defendants for purposes of an unjust enrichment claim, as Plaintiffs worked at St. Michael's (*see, e.g.*, ECF No. 12 ¶ 25), and Prime and Dr. Reddy exerted control over their work at St. Michael's, *see supra* Section III.A. Plaintiffs should be able to further investigate the contours of their relationship with Defendants through discovery. *See Bullard v. Jaguar Land Rover Auto. PLC*, No. 20-14464, 2022 WL 17093052, at *8 (D.N.J. Nov. 21, 2022) ("[W]hether a direct relationship exists is 'a term of art,' and 'will depend heavily on the facts of the individual case.'" (quoting *DeFrank v. Samsung Elecs. Am., Inc.*, Civ. A. No. 19-21401, 2020

20

WL 6269277, at *23 (D.N.J. Oct. 26, 2020))). Accordingly, Defendants' Motion to Dismiss

Plaintiffs' unjust enrichment claim is **DENIED**.[7]

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss (ECF No. 22) is **DENIED**.

An appropriate order follows.

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated:  July 27, 2026

---

[7] The Amended Complaint labels the third claim for relief as "Quantum Meruit" (ECF No. 12 at 18), but the first page of the Amended Complaint labels the claim as "Unjust Enrichment/Quantum Meruit" (*id.* at 1), and the parties refer to the claim only as "unjust enrichment" in their briefing (*see* ECF No. 22-1 at 17; ECF No. 23 at 18; ECF No. 24 at 14). For the sake of completeness, the Court will also consider the elements of quantum meruit. "To recover under a theory of *quantum meruit*, a plaintiff must establish: '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Starkey, Kelly, Blaney, & White v. Estate of Nicolaysen*, 796 A.2d 238, 242–43 (N.J. 2002) (citing *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994)). The first three elements are supported by the allegations discussed with respect to unjust enrichment above. *See supra* Section III.C. As for the final element—the reasonable value of Plaintiffs' services—Plaintiffs list their unpaid wages and benefits in Exhibit 3 to the Amended Complaint, for a total of $2,255,560.92. (ECF No. 12-3.) Therefore, the Court finds Plaintiffs have alleged sufficient facts to support a claim for quantum meruit.